IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

STANLEY SIMS,

      Plaintiff,               No. CIV S-07-0898 MCE EFB P

      vs.

VEAL, et al.,

      Defendants.          <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

      Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983. The gist of his complaint is that he was subjected to retaliation by the defendants for his having refused to become a "snitch" or informant. The defendants have moved for summary judgment and for the reasons explained below, the court finds that the motion must be granted.

**I.    Procedural History**

      This action proceeds on the amended complaint filed November 9, 2007. In that complaint, plaintiff makes five claims. The first four claims allege that Defendant Halverson retaliated against plaintiff for refusing to be an informant. Plaintiff alleges this retaliation took the following forms: (1) that defendant D. Halverson changed plaintiff's custody level from Medium A to Close B, thus causing plaintiff to lose his job assisting a cook; (2) that defendant

Halverson confiscated plaintiff's card necessary to obtain a liquid diet; (3) that defendant

Halverson caused defendants Lesane and Petrey to deny plaintiff access to the restroom for over

two hours; (4) that defendant Halverson caused Lesane to subject plaintiff to a random search of

his person; and, (5) that defendant Halverson caused defendants Lesane and Lee to confiscate the

card plaintiff needed to obtain a medically necessary special diet. Plaintiff also appears to allege

retaliatory acts by Lesane, Lee and Petrey, independent of the retaliation that plaintiff attributes

to defendant Halverson. Interwoven with his allegations of retaliation plaintiff also claims that

defendants Lesane and Lee subjected plaintiff to cruel and unusual punishment when they

handcuffed him and placed him in a holding cell for four hours.

## II.     Facts

Plaintiff is confined at California State Prison at Corcoran but at the time of the events

alleged in this action he was housed at the California Medical Facility (hereafter "CMF").

Plaintiff's Second Amended Complaint[1] (hereafter "Am. Compl."), at 3-4. At the time of alleged

the events all of the defendants were guards at CMF. Am. Compl., at 4-5. In 2005, defendant

Halverson was a sergeant assigned to the kitchen. Def.'s Mot. for Summ. J., Ex. 1, Declaration

of Halverson (hereafter "Halverson Decl."), ¶ 2. In 2006, he became a Correctional Counselor.

Halverson Decl., ¶ 3. As a correctional counselor, Defendant Halverson served on the

Classification Committee that plaintiff appeared before for an annual review on May 11, 2006.

*Id*. Neither defendants Lesane nor Lee elaborate on their positions at the time of the events

giving rise to this action. They only state, "I am employed by the California Department of

Corrections and Rehabilitation." Lesane Decl., ¶ 1; Lee Decl., ¶ 1.

Plaintiff's allegations of retaliation assert that the defendants failed to comply with the

proper procedures for how prison officials within the California Department of Corrections and

---

[1] Plaintiff filed a form complaint with an 18-page handwritten complaint attached to it. In all references to the amended complaint, the court refers to this handwritten complaint unless otherwise stated.

Rehabilitations (hereafter "CDCR") are to determine prisoners' security classifications. Under the Department's inmate security classification system each prisoner is assigned a "custody designation." *See* Cal. Code Regs. tit 15, §3377.1. To do this, Unit Classification Committees (hereafter "UCC") meet with each prisoner upon entry in a particular prison and annually thereafter to determine, amongst other things, a prisoner's custody designation. *See* Cal. Code Regs. tit. 15, § 3376(d)(1), & (d)(2)(A). Quite obviously, these designations are important to prison officials for security and other penological interests. There is a range of custody designations and various factors are used to determine which designation is appropriate for a particular prisoner, including the prisoner's sentence, escape history and whether the prisoner has be found guilty of serious charges in a Rules Violation Report (hereafter "RVR"). Cal. Code Regs. tit. 15, § 3377.2(a)(1). The range of designations include Maximum Custody, Close Custody A or B, Medium Custody A or B, and Minimum Custody A or B. Cal. Code Regs. tit. 15, § 3377.1(a). The court here is concerned with Close Custody A, Close Custody B and Medium Custody A. In particular, plaintiff at various times was classified in the categories of Close Custody A and B.

A prisoner who satisfies more than one of the criteria for Close A must receive that designation "for the longest required amount of time before becoming eligible for Close B Custody consideration." Cal. Code Regs. tit. 15, §§ 3377/2(a)(1), 3377.2(b). Thus, a prisoner serving a sentence of anywhere from 15 to 50 years who presents no "management concerns" must be designated Close A for the first year of his commitment to the CDCR. Cal. Code Regs. tit. 15, § 3377.2(b)(3)(D). Following one year of Close A custody, a prisoner serving a term anywhere from 15 to 50 years who presents no "management concerns" and who has no escape history, must serve the next four years with a Close B designation. Cal. Code Regs. tit 15, § 3377.2(c)(3)(D). Prisoners designated as Close A "are not permitted beyond the work change

////

////

area."[2] Cal. Code Regs. tit. 15, § 3377.1(a)(2)(B). Prisoners designated as Close B, however, may participate in work programs that are outside the "work change area," and may work until later in the evening than may Close A prisoners. Cal. Code Regs. tit. 15, § 3377.1(a)(2)(B), (a)(4)(B).

The regulations do not provide information on the criteria for designating a prisoner as Medium Custody A. However, it is clear that such a designation allows for much more freedom of movement than do Close Custody A and B. A prisoner designated Medium Custody A may be housed in a dormitory within the facility's "security perimeter,"[3] and must be assigned to activities within that perimeter. Cal. Code Regs. tit. 15, § 3371.1(a)(6).

The application of this classification system to plaintiff begins with his initial commitment. On May 1, 2003, he was sentenced to a term of 19 years and committed to the custody of the CDCR. Am. Compl., Ex. C, at 8, 11. Upon his arrival at CMF in July 2003, prison officials mistakenly designated plaintiff as Medium A. It is undisputed that he should have been designated as Close A. *See* Am. Compl., Ex. A, at 7, 10. The result of this error is that plaintiff had more freedom and was able to work in areas that he otherwise would have been denied. He was at the Medium A level of custody in May 2005, when he began working as a cook in one of the CMF kitchens. Notwithstanding the mistaken classification he apparently performed satisfactorily in the kitchen job. According to a note written by his supervisor in 2006, plaintiff was a good worker in that he "has contributed to the daily success of the Food Service Department." *See Id.*; Am. Compl., at 6, & Ex. E.

////

---

[2] A "work change area" is "a portal controlled by staff and/or locking gates that is used to control access and includes the area where staff search inmates prior to permitting inmates in or out of adjacent areas such as Prison Industry Authority Yards." Cal. Code Regs. tit 15, § 3000.

[3] A "security perimeter" is "any unbroken physical barrier or combination of physical barriers that restricts inmate movement to a contained area without being processed through a door, gate or sallyport." Cal. Code Regs. tit. 15, § 3000.

Plaintiff alleges that while he worked in the kitchen as a cook, defendant Halverson approached him and requested that he provide information about alleged gang members who also worked in the kitchen. Am. Compl., at 6. Plaintiff declined, explaining that prisoner informants risk violence at the hands of other prisoners. *Id.* According to plaintiff, defendant Halverson responded to this refusal with a promise that plaintiff would regret his decision. Am. Compl., at 6-7. Plaintiff further claims that on May 26, 2005, after he refused to be an informant but while he still worked in the kitchen, defendant Halverson confiscated the card plaintiff needed to obtain a liquid diet. Am. Compl., at 7 (citing to Ex. D); Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. (hereafter, "Pl.'s Mem."), at 1. On June 14, 2005, the dietician returned it to him after receiving a grievance from plaintiff. Pl.'s Mem, at 1. Plaintiff claims that once he received the card, defendant Halverson told him that "he [Halverson] will get plaintiff." Am. Compl., at 7. Defendant Halverson denies that statement and denies that he asked plaintiff to become an informant.[4] Halverson Decl., ¶ 5.

On May 11, 2005, plaintiff appeared before a UCC for an annual review of his security classification, work and housing assignment, mental health participation and custody level. Am. Compl., Ex. A, at 7. At the time, plaintiff was still designated as Medium A for custody purposes. The Committee reviewed the factors for determining plaintiff's custody level and declined to change it, noting "MED A custody remains appropriate." *Id.* One year later, on May 11, 2006, plaintiff appeared before another UCC for his annual review. *Id.*, Ex. A, at 8. The Committee again reviewed the factors relevant to plaintiff's custody level. *Id.* At this review, the Committee noted that:

> Subject was initially assigned to MED-A custody due to an administrative error, therefore today's UCC elects to increase Subject's custody from MED-A to CLO-B noting Subject will be eligible for MED-A custody effective 8-4-08. In

---

[4] Plaintiff does not allege any specific time when this occurred, but given his allegation that Defendant Halverson retaliated against him for refusing to become an informant, the court assumes for purposes of this motion that it occurred before the allegedly retaliatory acts, including the redesignation of plaintiff's custody level.

addition, UCC notes that the Subject is currently assigned to work position # MKWF1059, which work hours conflict with Subjects CLO-B custody, therefore committee elects to a non-adversely unassign Subject from position # MKWF1059 and place on the food handlers waiting list.

Am. Compl., Ex. A, at 8. The captain overseeing the review, Captain St. Germain, ordered the change. Halverson Decl., ¶ 3. Defendant Halverson was present, but he merely served as the committee recorder. Am. Compl., Ex. A, at 8; Halverson Decl., ¶ 4. Defendant Halverson asserts that he had no influence over the proceedings, including the decision to change plaintiff's custody designation. Halverson Decl., ¶ 4. However, as a result of the change in the custody designation, plaintiff was removed from his job as a cook in the kitchen and placed in a job with more restrictions on his movement and no pay. Pl.'s Mem., at 3.

Plaintiff also alleges that at some unspecified time, defendant Halverson made telephone calls to the kitchen and encouraged kitchen staff to take adverse action against plaintiff for his refusing to become an informant. Am. Compl., at 9. He alleges that thereafter, defendant Lesane prevented him from using the bathroom for nearly two and one-half hours. *Id*. There apparently was some disagreement about whether plaintiff should have to use a kitchen restroom rather than the one in his cell. Plaintiff states that he was attempting to leave the kitchen when defendant Lesane threatened plaintiff that if he did not move away from the gate, he would handcuff plaintiff and put him in a holding cell. *Id*. Plaintiff alleges that given his age, 50, he suffered attempting to control his bladder for the time he was not allowed to use the restroom. *Id*. According to defendant Lesane, plaintiff told Lesane that he wanted to use the restroom in his cell. Lesane Decl., ¶ 2. However, as defendant Lesane explains it, prisoners have access to a restroom in the kitchen area, and Lesane told plaintiff to use that one but plaintiff refused to use it. Lesane Decl., ¶ 3. Plaintiff does not deny knowing that there was a kitchen restroom available or explain why he would not use it. He does, however, deny complaining that it was unsanitary and lacked privacy. Pl.'s Mem., at 4. This refusal made defendant Lesane skeptical about the reasons for plaintiff's desire to leave the kitchen area. Lesane Decl., ¶ 4. Defendant

Lesane did not believe that plaintiff intended to use the facilities in his cell. *Id*. Therefore,

defendant Lesane ordered Petrey, who controlled the gate, not to open it. Lesane Decl., ¶ 4. Pl.'s

Mem., at 4. Instead, defendant Lesane handcuffed plaintiff and placed him in a holding cell near

the kitchen area because plaintiff persisted with his insistence that he be permitted to use the

restroom in his cell.[5] Am. Compl., at 9; Lesane Decl., ¶¶ 1, 2, 5.[6]

At around 6:30 a.m. on February 23, 2007, plaintiff was released from the holding cell

for breakfast. Am. Compl., at 10. He had specific authorization for a liquid diet because he has

no molars. *Id*. In order to obtain his special meals, however, plaintiff had to present a card

proving his entitlement to a special diet. *Id*. He alleges that as he was waiting to receive his

meal, defendants Lesane and Lee "accosted" him, handcuffed him behind his back, placed him in

a holding cell for four hours and confiscated his diet card. *Id*. He claims that he was in

handcuffs the entire time he was in the cell. *Id*. He further alleges that the confiscation was "per

orders of Def Haverson [sic]." Am. Compl., at 11. Plaintiff claims that as a result of remaining

handcuffed in the holding cell for four hours he suffered from shoulder pain.[7] Am. Compl., at

10.

The parties agree that defendants Lesane and Lee confiscated plaintiff's food card during

the February 23 incident. Am. Compl., at 11; Lesane Decl., ¶ 6; Lee Decl., ¶ 2. Plaintiff asserts

that as a result, he did not eat for five days. Am. Compl., at 11.

////

////

---

[5] This is not the placement in a holding cell that plaintiff challenges in the complaint.

[6] Defendants' counsel submitted two declarations signed by defendant Lesane. The second duplicates the first several paragraphs of the first complaint. It contains no information that is not included in the first declaration.

[7] On May 10, 2007, plaintiff submitted a written request for an examination because "the joints in [his] shoulder hurt all the time, my joints have been hurting for over (2) months now and it's getting worse." Pl.'s Opp'n, Ex. J-2. Eventually, he was diagnosed as having a rotator cuff injury. Am. Compl., at 10-11; Pl.'s Opp'n, Ex. J-30

Although defendants Lesane and Lee's accounts of the events do not differ from plaintiff's in material ways, they provide additional context and detail. Defendant Lesane asserts that when plaintiff was detained, he should have been in an area designated for those who receive special diets. Lesane Decl., ¶ 6. Lesane says that he found plaintiff "out of bounds"[8] attempting to obtain food that was not part of his liquid diet, i.e., chicken. *Id.* After confiscating plaintiff's card, defendants Lesane and Lee handcuffed plaintiff, and placed him into a holding cell. Lesane Decl., ¶ 6, 7; Lee Decl., ¶¶ 2, 3. Lesane and Lee assert that they did not know handcuffing a prisoner in a routine manner could result in an injury to the rotator cuff. Lesane Decl., ¶ 8; Lee Decl., ¶ 4.

Without specifying when, plaintiff asserts that defendant Lesane ordered another guard to search plaintiff immediately after plaintiff had been subjected to a strip search. Am. Compl., at 9. He states that defendant Lesane was present when he was "fully searched completely down to my bare skin." *Id.* Plaintiff alleges that no sooner had plaintiff left the strip search room when defendant Lesane, who had followed him out of the room, ordered another guard, Vermosa, to "put [him] on the wall" and search plaintiff again. Am. Compl. 9-10. Lesane explains that plaintiff was subjected to a strip-search pursuant to a policy requiring such searches of prisoners who work in the kitchen. Lesane Decl. 1, ¶ 10. The purpose of this policy is to ensure that prisoners do not take items from the kitchen and later use them as weapons. *Id.* Lesane does not deny ordering the clothed search performed on plaintiff immediately following the strip search. Lesane Decl. 1, ¶ 11.

## III. Summary Judgment Standards

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[8] Lesane does not define this term. However, the court understands it to mean that plaintiff was in an area where he should not have been.

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts. *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to screen the latter cases from those which actually require resolution of genuine disputes over material facts; e.g., issues that can only be determined through presentation of testimony at trial such as the credibility of conflicting testimony over facts that make a difference in the outcome. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Focus on where the burden of proof lies as to the issue in question is crucial to summary judgment procedures. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing

party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In this regard, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In attempting to establish the existence of a factual dispute that is genuine, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.

Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). However, the opposing party must demonstrate with adequate evidence a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989). The opposing party must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252. If the evidence presented could not support a judgment in the opposing party's favor, there is no genuine issue. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. at 323.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be

drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

On May 5, 2008, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

**IV. Analysis**

Plaintiff asserts claims of retaliation and cruel and unusual punishment. The court addressed each claim seriatim.

**A. Retaliation Claims**

There are five elements to a retaliation claim: (1) a state actor took some adverse action against a prisoner; (2) because (3) the prisoner engaged in protected conduct; (4) resulting in the chilling of plaintiff's First Amendment rights; and (5) the action did not reasonably advance a legitimate penological goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2003). To survive summary judgment, plaintiff must submit evidence that prison officials took some action against him "for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals." *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam). Institutional order and discipline are legitimate penological goals. *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985). Plaintiff has the burden of establishing a causal connection between the exercise of constitutional rights and the allegedly retaliatory action. *See*

*Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir.1995). Causation may be shown by evidence sufficient for a jury to infer that the defendant's conduct was motivated by the plaintiff's exercise of a protected right. This may consist of direct evidence or of circumstantial evidence, such as a defendant's conduct inconsistent with previous acts and the temporal proximity between the plaintiff's exercise of his right and the allegedly retaliatory conduct. *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003); *see also Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 751-52 (9th Cir. 2001).

## B. Retaliation by Defendant Halverson

### 1. <u>Plaintiff's Job Loss</u>

Plaintiff alleges that defendant Halverson changed plaintiff's custody level from Medium A to Close B in retaliation for plaintiff refusing to become an informant. Defendant Halverson contends there is no genuine dispute about whether he asked plaintiff to be an informant, and that in any event plaintiff's refusal to be an informant is not the exercise of a First Amendment right. He also contends that there is no genuine dispute about whether the custody classification change served a legitimate penological interest or whether he caused the change.

The court first addresses defendant Halverson's contention that there is no genuine dispute about whether he asked plaintiff to become an informant. Halverson denies in his declaration that he made any such request. In contrast, plaintiff states in his verified complaint and with some particularity that not only did the defendant make such a request, but he communicated a specific agenda motivating the request. He also alleges that defendant Halverson threatened plaintiff that he would regret refusing to participate, confiscated his special diet card, and threatened "to get" plaintiff. Those sworn allegations in the verified complaint are adequate to serve as a declaration for purposes of plaintiff's opposition to this motion. [9] Thus,

---

[9] A verified complaint based on personal knowledge setting forth specific facts admissible in evidence is treated as an affidavit. *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995); *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987)

the question here is whether to believe defendant Halverson or plaintiff. Defendant Halverson

has pressed his arguments for why a fact finder should credit his testimony and reject plaintiff's.

A reasonable fact finder could do either and the court cannot make such a credibility

determination on summary judgment. Therefore, the defendant cannot succeed on his motion

with this argument.

However, asking an inmate to be an informant does not, itself, violate any specific

federally protected right.[10]  Plaintiff must also show that defendant Halverson retaliated.  As to

the loss of his job, plaintiff has not met his burden of presenting evidence upon which he could

prevail in establishing that this was the result of retaliation.  He fails to demonstrate a genuine

dispute over the material issue of whether defendant Halverson took any adverse, unjustified

action against plaintiff to remove plaintiff from the kitchen job.  Plaintiff's theory of the claim is

that Halverson caused the change in plaintiff's custody designation, thereby causing plaintiff to

lose his job as a cook.  Yet, it is undisputed that when plaintiff was committed to the CDCR, his

custody level should have been classified as "Close A" which renders him ineligible for the job.

////

////

////

////

---

[10]  Defendant Halverson presses this argument beyond what is supported by the record. Asserting that "a refusal to provide information to a law enforcement officer is not protected by the Constitution," Def.'s Mot. for Summ. J., at 8, he argues that the refusal to be a prison informant "likely constitutes the criminal offense of obstructing a peace officer in the performance of his duties."  The facts alleged here, however, are not that plaintiff was punished because he committed a criminal offense; i.e. of obstruction of justice.  Rather, the verified complaint describes with specificity demands by defendant Halverson that plaintiff report as gang members individuals defendant Halverson disliked so that they would be expelled from the kitchen.  Thus, there is little, if any, factual support for the contention that plaintiff's unwillingness to endanger himself by becoming "a snitch" or "informant" was itself a criminal offense.  Moreover, no authority is provided for the assertion that an inmate has no protected right to refuse to become a prison informant.  However, the court need not resolved the question here because, as discussed below, plaintiff fails to establish retaliatory acts by defendant Halverson.

It also is undisputed that after a year the error was corrected. Plaintiff was redesignated as Close

B, a classification that remained for another four years.[11] Finally, it is undisputed that the change

of jobs resulted from the change in custody designation. Plaintiff has not submitted any

evidence to show that the change in his custody designation was for any reason other than to

remedy an administrative error. Neither has he submitted any evidence that there is causal nexus

between his refusal to be an informant and the new custody level classification, or indeed, that

the new classification was inappropriate. Accordingly, there is no genuine issue for trial as to

retaliation or as to whether there was a legitimate penological reason for the change in plaintiff's

custody level and the resulting change in his job assignment. The lack of a genuine dispute on

this required element of plaintiff's retaliation claim renders all other disputes as to his job loss

claim immaterial. Therefore, Defendant Halverson is entitled to judgment as a matter of law on

this claim.

### 2. **Defendant Halverson's Confiscation of Plaintiff's Diet Card**

Plaintiff also alleges that defendant Halverson retaliated against plaintiff by confiscating

the diet card that he needed to obtain a special diet. Am. Compl., at 7 (citing to Ex. D).[12] He

alleges that defendant Halverson asked him to be an informant so that defendant Halverson could

orchestrate the expulsion of individuals he did not like from the kitchen. When plaintiff refused,

defendant Halverson warned plaintiff that he would regret his decision. Thereafter, on May 26,

---

[11] Defendant Halverson has submitted evidence that the Medium A designation was an administrative error, and that the UCC remedied this error in May of 2006 by changing plaintiff's custody designation from Medium A to Close B. Under the applicable regulations, the Close B designation was appropriate, which necessarily results in less freedom and fewer job options.

[12] This claim is distinct from the allegation that nearly two years later, on February 23, 2007, Lesane and Lee confiscated plaintiff's special diet card. The latter claim is discussed *infra*. Plaintiff's Exhibit D, which is a copy of his administrative grievance over the May 26, 2005 confiscation, describes the details of this claim. The gist of the allegation is that plaintiff had a "no meat" diet card which had been issued because of stomach problems. Plaintiff claims that Defendant Halverson stopped plaintiff on his way to the dinning room for breakfast and, according to plaintiff, asked whether "I was going to eat in and he confiscated my NO MEAT card." Exh. D

2005, Halverson confiscated plaintiff's diet card. It was returned on June 14, 2005, after plaintiff filed a grievance.

Although plaintiff's allegations in the verified complaint are detailed and present this claim, Defendant Halverson has not addressed it in either his motion for summary judgment or in his reply to plaintiff's opposition. The failure to address it provides the court no basis for granting summary judgment on the question. Defendant must either file an appropriate motion addressing this claim or go to trial on it. In this regard, a defendant has an obligation to address by an appropriate and timely motion all dispositive motions and not latter attempt to do so in the guise of in limine motions or evidentiary objections at trial. If there is no genuine factual issue warranting a trial on this claim, defendant must raise it in an appropriate dispositive motion.

### C. Retaliatory Acts by Defendants Lesane and Petrey - Denial of Restroom Access

Plaintiff asserts that other prison staff retaliated against him. He alleges that during the incident when plaintiff attempted to leave his prison work station in the kitchen defendants Lesane and Petrey refused to permit him to use the restroom for over two hours. Am. Compl., at 8-9. While these facts are taken as undisputed for purposes of evaluating this motion, this claim must be examined in light of the fundamental principle that the maintenance of institutional order, discipline, and security are legitimate penological goals. *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994); *see also Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985). To that end, prison officials have broad discretion to limit the movement of prisoners in order to maintain security. *See*, *e.g., Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir.1980) (denial of outdoor exercise for bonafide security reasons does not violate the Eighth Amendment); *see also May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (no First Amendment right to visit the law library so long as reasonable alternative is provided); *Sandin v. Conner*, 515 U.S. 472, 485-86 (1995) (the limitations of placement in administrative segregation where significant "lockdown time" is imposed dos not *per se* deprive prisoner of a federally protected liberty interest).

////

Here, it is undisputed that plaintiff told defendant Lesane that he needed to use the restroom and tried to leave the kitchen area during work hours to do so.  It also is undisputed that defendant Lesane refused to let plaintiff leave and directed defendant Petrey not to open the gate leading out of the kitchen.  Plaintiff states that he persisted, telling Lesane that he could not wait.  Pl.'s Mem, at 4.  In his declaration, Lesane points out that there was a restroom available in the kitchen.  He says that he told plaintiff to use it.  The parties agree that in response to plaintiff's persistence, defendant Lesane threatened to handcuff plaintiff and place him in a holding cell.  *Id.*; Am. Compl., at 9.  Defendant Lesane explains that this was because there was a restroom available to plaintiff, which made him suspicious of plaintiff's persistent demand to be let out of the kitchen area.  Significantly, plaintiff does not contest the fact that Lesane ordered him to use the kitchen bathroom if he needed a restroom.  Pl.'s Mem, at 4.  Thus, it is fair to infer that plaintiff knew a restroom was available for his use without having to pass through the security gate to leave the kitchen area.  While plaintiff denies refusing to use the bathroom in the kitchen area, he also asserts that he did not use a bathroom for over two hours and concedes that he persistently demanded that he be allowed to leave the kitchen area.  Thus, it appears from the record that plaintiff did refuse to use it, if only by his persisting in leaving the kitchen area.  Plaintiff does not explain this refusal and the record before the court demonstrates a legitimate, non-retaliatory reason for plaintiff not to be permitted to leave the location of his prison job.

The only allegation against defendant Petrey is that he obeyed Lesane's order not to open the kitchen gate.  Just as defendant Lesane's refusal to allow plaintiff leave the work area served a legitimate penological interest, so did defendant Petrey's obedience to Lesane's order not to open the gate to enable plaintiff to leave.  On these facts, there is no genuine issue about whether plaintiff had access to a restroom.  The record shows plainly that he did.  Plaintiff's evidence is insufficient to demonstrate a genuine issue about whether there was a legitimate penological reason for refusing plaintiff's request to leave the kitchen area.

Lesane and Petrey are entitled to summary judgment on this claim.

### D.  Unjustified Search by Lesane

Plaintiff alleges that defendant Lesane ordered another guard, Vermosa, to search plaintiff immediately after he had already been strip searched.  Am. Compl., at 9-10.  Lesane asserts that the search did not violate the Fourth Amendment; and, therefore, plaintiff cannot demonstrate a genuine issue about whether he was subjected to any adverse action  Specifically, defendant Lesane argues that "[n]ot to be subject to search while incarcerated is not protected conduct under the legal standard for retaliation" and that "as a condition of their incarceration, inmates are subject to search at any time."  Therefore, Lesane concludes, "searching an inmate cannot constitute an adverse action for purposes of a retaliation claim."[13]  Def.'s Mot. for Summ. J., Mem. of P. & A. in Supp. Thereof, at 14.  The argument misses the mark.  The interest asserted in a retaliation claim is one of not being subjected to conditions that otherwise would not be imposed but for the retaliatory motive.  Thus, the liberty interest asserted is not to be free of frequent and multiple searches, bur rather not to be singled out for repeated searches based on retaliation instead of legitimate security needs.  In a claim of retaliation, plaintiff need not prove that the adverse action allegedly taken violated a constitutional right.  *Pratt v. Rowland*, 65 F.3d 802, 806 (1995) (stating that to prevail on a retaliation claim, plaintiff need not "establish an

---

[13]  Defendant Lesane premises this argument on *Hudson v. Palmer*, 468 U.S. 517, 526, 528 (1984), arguing that "[i]nmates and their property can be searched at any time; no reason is required," and "no reason is required for an inmate to be searched."  This reads *Hudson* more broadly than warranted.  In *Hudson*, the Supreme Court considered a search of a prisoner's cell.  There was no allegation that the prisoner himself was searched.  *See Hudson*, 468 U.S. at 519-20.  The respondent alleged only that a guard had searched his cell and destroyed his property.  Thus, the Court considered whether prisoners have a legitimate expectation of privacy in their cells, and concluded that they do not.  *Id.* at 525-26, 536.  Whether prisoners retain a legitimate expectation of privacy in their person is governed by two general principles.  The first is that, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison."  *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  The second is that prisoners retain those constitutional rights that are not inconsistent with their status as prisoners or with the legitimate penological goals of the corrections systems.  *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  Compelling interests in security would ordinarily justify an inmate search, as did the search of the cell in *Hudson*.  However, the particular circumstances, as determined in light of *Bell* and *Pell*, will determine if the search is appropriate. Applying those principles, the Ninth Circuit has held that prisoners do retain a legitimate expectation of privacy in their persons.  *See Michenfelder v. Sumner*, 860 F.2d 328, 331, 332 (1988).

independent constitutional interest" was violated); *see also, e.g., Hines v. Gomez*, 108 F.3d 265, 268 (9th Cir. 1997) (upholding jury determination of retaliation by filing false rules violation report); *see also Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (transfer of prisoner to a different prison constituted adverse action for purposes of retaliation claim). Instead, he must show retaliation for his refusal to become an informant.

In a prison setting, it would not appear to be difficult for prison authorities to articulate facts warranting the search of an inmate. But here, defendant Lesane, who does not dispute that he caused plaintiff to be searched immediately following a strip search, offers no explanation for why the immediately preceding stip search had not satisfied the legitimate security goal of searching inmates. There is no further argument about whether the immediately following search served a legitimate penological purpose, a factor that complicates analysis of summary judgment as to this claim. However, the claim ultimately fails because plaintiff has not presented evidence to establish a nexus between the search and his refusal to become an informant. As the party who bears the burden of proof on the matter, plaintiff must produce evidence sufficient to show that defendant Lesane's act was retaliatory. Thus, there must be evidence that Lesane knew that the plaintiff refused to become an informant for defendant Halveson. As discussed above, there is no evidence of this. Thus, there is no genuine dispute about whether the search was retaliatory. Therefore, defendants are entitled to summary judgment as to this claim.

### E. Confiscation of Diet Card by Lesane and Lee

Plaintiff's final allegation of retaliation is that on February 23, 2007, defendants Lesane and Lee confiscated plaintiff's special diet card. He asserts that this confiscation was "per orders of Def Haverson [sic]," Am. Compl., at 11, and that the card was not returned for nearly a week. He asserts he did not eat during that time. Defendants Lesane and Lee argue that plaintiff cannot demonstrate a genuine issue for trial as to whether the confiscation was for a legitimate penological purpose.

Plaintiff is missing his molars and his authorization for a liquid diet is not disputed. To obtain this special diet, plaintiff must present his card and go to a location of the cafeteria that is designated for prisoners with special dietary needs. Here, he claims that on the date in question he went, as usual, to "chowhall #3" to obtain his liquid diet, but he was "accosted [sic] by Sergeant Lesane [sic] and c/o R. Lee while waiting to eat." Am. Compl., at 10. He states that they placed him in a holding cell and confiscated his diet card.

Defendants do not dispute confiscating the card and placing plaintiff in the holding cell. However, they state in their respective declarations that they did so because plaintiff was "out of bounds," i.e., present in an area of the prison he was not authorized to enter. Specifically, they state that plaintiff had entered the area of the cafeteria where prisoners *without* special diet needs obtain their meals, and that he was attempting to get piece of chicken from the main dinning hall. They state that prison policy provides for the confiscation of an inmate's diet card if the inmate is found getting food that is not on the inmate's diet plan. Leasane Decl., ¶ 6. Thus, they explain that plaintiff's diet card was confiscated as a result of his attempt to obtain unauthorized food. *Id.* Partially conceding this, plaintiff asserts that for at least a year preceding this incident, the staff who supervised him in his job allowed him to enter the kitchen on his days off to eat left-overs from the previous night's dinner. Pl.'s Mem., at 6. Plaintiff says that this was an "unwritten privilege" that kitchen staff afforded prisoner employees. *Id.* Plaintiff does not deny obtaining a piece of chicken from that area on the day in question. Thus, there does not appear to be a genuine factual dispute over whether he had entered a part of the prison that was off-limits to him. Restraint on inmates' movement to various locations within the prison is undoubtedly a legitimate security interest. And prison security is a legitimate penological purpose. *Rizzo v. Dawson*, 65 F.3d 802, 807 (9th Cir. 1995). Defendants Lesane and Lee were entitled to enforce prison rules and prevent plaintiff from entering a part of the dining hall from which he was prohibited when he was not working.

////

Plaintiff further alleges that he was without his diet card for five days and he could not eat without his liquid diet. Am. Compl., at 11. The defendants dispute this claim, but the dispute is ultimately immaterial to the retaliation claim. As discussed, *supra*, the retaliation claim fails because plaintiff presents no evidence that Lesane and Lee were aware of Halveson's alleged request that plaintiff become an informant, or of plaintiff's alleged refusal. There simply is no supporting evidence upon which a fact finder could conclude that defendants Lesane and Lee's motivation for their actions toward plaintiff was retaliation for protected activity. Accordingly, defendants are entitled to summary judgment as to this retaliation claim.

However, the dispute is not immaterial to any free standing claim under the Eighth Amendment. Plaintiff specifically alleges that "for (5) days Plaintiff was denied Food . . . ." *Id.* He describes this deprivation of food as not only retaliatory, but also as "cruel and unusual Punishment . . . ." *Id.* at 12. Thus, the complaint, fairly construed, asserts both claims of retaliation as well as a free standing claim that this same conduct violated plaintiff's Eighth Amendment rights regardless of whether motivated by retaliation. In opposition to the motion for summary judgment plaintiff alleges in his declaration that during the five days that the card was withheld from him he "could not eat . . . ." Pl.'s Decl. at 2 - 3. Although defendants challenge the credibility of that assertion, their motion presents little information on whether plaintiff was or was not offered *any* food, or whether he was offered food that was edible to him, i.e., soft foods. To be sure, plaintiff has also asserted that he often ate regular food from the kitchen for prisoners without special dietary needs. However, the record is inadequate to conclude that defendants are entitled to judgment as a matter of law on the claim that defendants withheld food from plaintiff for a period of five days.

**F. Handcuffs Too Tight - Lesane and Lee**

Plaintiff alleges that when defendants Lesane and Lee detained him on February 23, 2007, they subjected him to cruel and unusual punishment by keeping his handcuffs too tight for

////

a prolonged period.[14]  In particular, he claims that when Lesane and Lee placed him in the holding cell, they left him there with his hands cuffed "tight behind" his back for four hours and that this caused injury to his rotator cuff.  Defendants contend that there is no evidence to establish they had any knowledge that the mere placement of handcuffs was likely to cause a rotator cuff injury and therefore no evidence to establish that they acted with deliberate indifference to a known dangerous condition.  They also argue that there is no evidence to establish a causal connection between plaintiff's alleged shoulder condition and the handcuffs.

The Eighth Amendment prohibits deliberate indifference to conditions of confinement that violate contemporary standards of decency, i.e, those which deny "the minimal civilized measure of life's necessities," or which pose a risk of a harm "that is not one today's society chooses to tolerate." *Rhodes v. Chapman*, 452 U.S. 337 (1981); *Helling v. McKinney*, 509 U.S. 25, 36 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The Eighth Amendment requires that the conditions of a prisoner's confinement, even if harsh, have some legitimate penological purpose.  *See Hudson v. Palmer*, 468 U.S. 517, 584 (1984); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  Conditions of confinement violate the Eighth Amendment if they cause unnecessary and wanton infliction of pain, i.e., a condition completely devoid of penological justification. *Rhodes v. Chapman*, 452 U.S. 337, 346-47 (1981); *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  Thus, prison officials violate the Eighth Amendment's prohibition on cruel and unusual punishment only if they are deliberately indifferent to a risk of harm at the hands of other prisoners.  *Farmer*, 511 U.S. at 837.  To be deliberately indifferent, a prison official must know

---

[14]  In the complaint, plaintiff claims that he was subjected to inhumane conditions of confinement, and the court construes the allegations as making a claim under *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991), and *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  He does not allege that defendants used force solely to harm him.  *See Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (standard for resolving an excessive force claim is whether the defendants used force sadistically and maliciously for the very purpose of causing harm).  In the memorandum he filed in opposition to the motion for summary judgment, plaintiff intermingles a claim of inhumane conditions of confinement and excessive force.  The court declines to permit plaintiff to add another claim in the course of opposing summary judgment.

of, or infer from the circumstances, a risk of harm or injury that "is not one that today's society chooses to tolerate," yet fail to take reasonable actions to mitigate or eliminate that risk. *Farmer*, 511 U.S. at 837.

Here, it is undisputed that defendants Lesane and Lee detained plaintiff after encountering him in an area of the prison where he was not permitted to be. Thus, there is no genuine dispute that the detention had a legitimate penological purpose. Additionally, although plaintiff complains that he was detained in a holding cell for four hours, he presents no evidence that this, of itself resulted in a known dangerous condition. Nor is there any evidence that the duration of plaintiff's detention was within the control of defendants Lesane and Lee. More significantly, there is no evidence that they knew the handcuffs were too tight during this time. There is no evidence that plaintiff complained to them about the cuffs and nothing in the record suggests that these defendants inferred or should have inferred from any circumstances that plaintiff's handcuffs were so tight that plaintiff was at an intolerable risk of injury. Thus, a reasonable jury could seriously conclude on this record that the defendants knew plaintiff was at risk of harm but failed to take reasonable action to abate that risk.

Because there is no genuine issue about an essential element which plaintiff must prove at trial, i.e., deliberate indifference, defendants Lesane and Lee are entitled to judgment as a matter of law on this claim.

**V.     Conclusion**

For the reasons explained above, the defendants are entitled to summary judgment on each claim in plaintiff's amended complaint except the claim that on May 26, 2005, defendant Halverson retaliated for engaging in protected activity by confiscating plaintiff's diet card, and the claim that in February 2007 the defendants withheld food from plaintiff for a period of five days.

////

////

Accordingly, it is RECOMMENDED that:

1. Defendants' March 27, 2009, motion for summary judgment be granted as to all claims except as noted in paragraph 2.

2. That defendants' March 27, 2009, motion for summary judgment be denied as to the claim that on May 26, 2005, defendant Halverson retaliated for engaging in protected activity by confiscating plaintiff's diet card, and the claim that in February 2007 the defendants withheld food from plaintiff for a period of five days.

3. That defendants be given 30 days to file an appropriate motion as to the remaining claims or, alternatively a pretrial statement as to those claims.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: September 2, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE