IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

STANLEY SIMS,

        Plaintiff,                      No. CIV S-07-0898 KJM EFB P

    vs.

VEAL, et al.,

        Defendants.              FINDINGS AND RECOMMENDATIONS

                                /

       Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983. The gist of his complaint is that defendants mistreated him because he refused to become a "snitch" or informant. The court's order of September 28, 2009, granted summary judgment in favor of defendants as to many of plaintiff's claims. Dckt. No. 69. The order of September 30, 2010, denied defendants' request for summary judgment of many of plaintiff's remaining claims, but granted defendant Halverson leave to file a motion for summary adjudication of plaintiff's claim against him for violation of the Eighth Amendment in 2005. Dckt. No. 85. Defendant Halverson has now filed such a motion. For the reasons provided below, the court finds that the motion must be granted.

////

////

## I. Summary of Plaintiff's Claim against Defendant Halverson

Plaintiff claims that on May 26, 2005, defendant Halverson confiscated the card plaintiff needed to obtain a "no meat" diet. Am. Compl., Dckt. No. 18 at 11[1] (citing to Ex. D). On June 14, 2005, the dietician returned the card to plaintiff after receiving plaintiff's grievance. Pl.'s Opp'n to Def.'s Mot. for Summ. J., Dckt. No. 93 at 6. Plaintiff claims he had difficulty obtaining adequate food during the interim period and consequently suffered pain, lost weight, and emotional distress. *Id.* at 6-7.

## II. Summary Judgment Standards

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to screen the latter cases from those which actually require resolution of genuine disputes over material facts; e.g., issues that can only be determined through presentation of testimony at trial such as the credibility of conflicting testimony over facts that make a difference in the outcome. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

---

[1] The page numbers cited to herein refer to those assigned by the court's electronic docketing system and not those assigned by the parties.

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In this regard, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In attempting to establish the existence of a factual dispute that is genuine, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.

////

Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). The opposing party must demonstrate with adequate evidence a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989). The opposing party must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson*, 477 U.S. at 248, 252. If the evidence presented could not support a judgment in the opposing party's favor, there is no genuine issue. *Id.*; *Celotex Corp.*, 477 U.S. at 323.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

On May 5, 2008, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

////

////

## III. Analysis

Defendant Halverson argues that summary judgment is appropriate on plaintiff's claim that the confiscation of his diet card on May 26, 2005 and the failure to return the card for 19 days violated his right to be free from cruel and unusual punishment under the Eighth Amendment.

### A. Facts Relevant to the Instant Motion for Summary Judgment

The parties have submitted separate statements providing the following specific facts, which are undisputed unless otherwise noted[2]:

In May 2005, plaintiff had a special diet card known as a "no meat" card.[3] Def.'s Mot.

---

[2] Plaintiff claims that numerous facts are disputed, but for multiple facts the evidence cited by plaintiff fails to actually dispute the facts allegedly in dispute or even have facial relevance to those facts. The court will note these instances in the footnotes.

[3] Plaintiff now specifies that the card restricted him from eating red meat, flour, and lactose, but the court notes that plaintiff has consistently referred to the card as simply a "no meat" card in past submissions to the court signed under penalty of perjury. *Compare* Pl.'s Statement of Disputed Facts in Opp'n to Def.'s Mot. for Summ. J. (hereinafter "PDF") No. 2 & Pl.'s Decl. in Opp'n to Def.'s Mot. for Summ. J. (hereinafter "Pl.'s Decl."), Dckt. No. 94 at 12, 15-16 (claiming that the diet card restricted him eating from red meat, flour, and lactose) *with* Dckt. No. 18, Am. Compl., Ex. D (plaintiff's administrative appeal complaining of the confiscation of his "no meat" diet card) & Pl's Decl. in Opp'n to Defs.' Mar. 27, 2009 Mot. for Summ. J. at 11-12 (referring to the diet card as a "no meat" card). Plaintiff has provided no copy of the diet card in effect in May 2005 (although he has provided copies of other diet cards covering later periods in 2006 and 2007, all providing for a liquid diet and none specifying no lactose or no flour, *see* Docket No. 94 at 21-23). Nor has plaintiff provided any explanation for the discrepancy between his earlier references to the card as a "no meat" card and his new assertion that the card restricted him from red meat, flour, and lactose. The discrepancy is particularly striking in light of defendant's argument and evidence that, during the time period plaintiff claims to have been deprived of food, he had access to many items of food in the prison's main dining hall, some of which contained lactose and flour. *See* DUF 33-41. Because plaintiff has previously described the card simply as a "no meat" card and has provided no evidence (other than his self-serving declaration) of these newly added assertions that the card also restricted him from eating other items, the court declines to accept plaintiff's new description and will consider DUF 2 entirely undisputed. *See FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010) (stating that, while "[s]pecific testimony by a single declarant can create a triable issue of fact, . . . the district court . . . need not find a genuine issue of fact if, in its determination, the particular declaration was uncorroborated and self-serving."); *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").

5

for Summ. J., Stmt. of Undisputed Facts In Supp. Thereof (hereinafter "DUF") No. 2. Such a card entitled the holder to receive double portions of non-meat items on the dining hall menu, in order to make up for the fact that the inmate did not eat meat. DUF 3; PDF 3. On May 26, 2005, defendant Halverson confiscated plaintiff's "no meat" card. DUF 4; PDF 4. The card was later returned to plaintiff. DUF 5; PDF 5.

California Medical Facility ("CMF"), where plaintiff was incarcerated at the time, has three separate dining halls that serve general population inmates. DUF 1, 8; PDF 1, 8. Dining Hall 3 serves inmates with special medical or religious dietary needs. DUF 9, PDF 9. An inmate who requested a meatless diet would be given a "no meat" card, allowing him to eat in Dining Hall 3, where he would know whom he would see and could expect to eat with at meals. DUF 10, 12; PDF 10. Racial, ethic, and interpersonal antagonisms and friendships make this important to many inmates. DUF 13. In addition, the holder of a special diet card received special food items with his dining hall meals and sack lunches that other general population inmates did not receive and which could be traded for ducat money or other items. DUF 14, 15; PDF 14. For these reasons, special diet cards were considered desirable, and it was not uncommon for inmates to try to get those cards. DUF 11, 16. The cards were not hard to get. DUF. 17.[4]

---

[4] Plaintiff purports to dispute DUF Nos. 11 (that a special diet card was desirable), 13 (that inmates care about where they eat meals due to interpersonal, racial, and ethnic antagonisms), 14 (that inmates with special diet cards got items that other inmates did not), 15 (that some inmates wanted those items because they could be traded), 16 (that inmates tried to get special diet cards because of the special items and access to Dining Hall 3), and 17 (that special diet cards were not hard to get). As evidence purporting to raise such a dispute, plaintiff cites to his own declaration at Nos. 6, 7, 10, and 14 (plaintiff's has assigned numbers to portions of his declaration that do not appear to correspond with the numbers of defendant's undisputed facts). In these portions of his declaration, plaintiff avers that he never personally sold or traded any of his food (No. 6), that he personally received his diet card for medical reasons (stomach problems), which defendant Halverson should have known (Nos. 7, 10), that he never ate anywhere other than Dining Hall 3 (No. 7), that he never misused his diet card (No. 7), that he is a mental health patient, which defendant Halverson knows (No. 14), and that plaintiff had trouble getting enough food to eat while he was without his diet card (No. 14). Plaintiff's evidence, where relevant, pertains solely to plaintiff's particular circumstances and does not create a dispute regarding defendant's general factual assertions. Nowhere in DUF Nos. 11 &

6

It was very common that an inmate would use his dietary card to eat in Dining Hall 3 until the regular halls served something he particularly wanted, such as hot links, hamburgers, or chicken; then he would eat in the regular dining hall, even if doing so was contraindicated by his diet card. DUF 18. Thus, the fact that an inmate had a "no meat" card did not necessarily mean that the inmate could eat only those foods indicated by the card, or that confiscation of the card would cause a hardship. DUF 19. It was important for correctional staff to monitor inmates' use of special diet cards, because misuse created tensions with genuinely religious inmates. DUF 20.[5] No special pass was required for inmates to eat at the regular dining hall. DUF 31; PDF 31.

The parties argue over whether, despite having been issued a "no meat" card, plaintiff could nevertheless access the main dining hall. As noted in the prior paragraph and attendant footnote, defendant's evidence shows that inmates with special diet cards often chose to access the main dining hall to obtain certain foods, and plaintiff has failed to come forward with

---

13-17 does defendant claim that plaintiff lacked a medical reason for his diet card, misused the card, or ate in other dining halls. Accordingly, plaintiff has failed to raise a dispute as to DUF Nos. 11 & 13-17 and the court will treat these facts as undisputed.

[5] Plaintiff claims to dispute DUF Nos. 18-20, citing to Nos. 4, 7-16, and 18 of his declaration. As noted in the prior footnote, plaintiff's declaration at Nos. 6, 7, 10, and 14 aver only that plaintiff himself did not misuse his validly-obtained card – facts which do not dispute defendant's assertions about inmate diet card use in general. Plaintiff's declaration at Nos. 4, 8, 9, 11-13, 15, 16, and 18, where relevant, fail to dispute DUF Nos. 18-20 for the same reason. In these sections of his declaration, plaintiff avers that he was prescribed the diet card by a doctor (No. 4), that defendant Halverson never saw him eating food in the regular dining hall (No. 8), that defendant Halverson used an underground prison policy to confiscate plaintiff's card to cause him harm (No. 9), that defendant Halverson never turned plaintiff's card in to the prison dietician (No. 9), that plaintiff worked at the main kitchen in the back, behind a locked gate (No. 11), that plaintiff was not allowed in the regular dining hall (No. 12), that defendant Halverson deprived plaintiff of a wholesome nutritionally balanced diet for 18-19 days intentionally to harm him (No. 13), that plaintiff was unaware of the expedited appeal process in 2005 (No. 15), that defendant Halverson should have found out that plaintiff needed the card for medical reasons (No. 15), that defendant Halverson lacked a legitimate penological objective in confiscating the card (No. 15), that "Haverson [sic] and his coworkers should know the rules and reg [sic] where having the power to cause harm I/M's [sic] by starving them" (No. 16), that defendant Halverson's claim that he saw plaintiff eating in the regular dining hall is not credible because, if that had occurred, "why he didn't [sic] report this on a CDC-128-B gen chrono [sic] to the doctor or dietician?" (No. 18), and that plaintiff never ate in the regular dining hall in 2005 (No. 18). As plaintiff's evidence does not dispute DUF Nos. 18-20, the court will treat these facts as undisputed.

7

evidence creating a dispute on this fact. DUF 18. Defendant's evidence thus indicates that possession of a special diet card did not prevent inmates from accessing the main dining hall. In addition, defendant declares that, during May 2005, he personally observed plaintiff eating regular food in the main dining hall "much of the time." DUF 21-22. Plaintiff's sole evidence to the contrary is his declaration, in which he states, "I was issued a special diet, I was not allowed in the regular dining hall." Dckt. No. 94 at 14, No. 12. Plaintiff further declares that, without his diet card, "eating became difficult" (*id.* at 12), that he never ate in any chow hall other than Dining Hall 3 (*id.* at 13, No. 7), and that defendant Halverson never observed him in the main dining hall but must have mistaken someone else for him, because if Halverson had seen him, he would have written plaintiff up (*id.*, No. 8 & at 16-17, No. 18).

Once again, plaintiff has relied solely on his self-serving and uncorroborated declaration to counter defendant's evidence that plaintiff could, and in fact did, eat regular food in the main dining hall during May 2005. Aside from failing to provide any corroboration whatsoever (whether it be a declaration from a fellow inmate or the dietician or a copy of a prison rule prohibiting inmates with special diet cards from eating in the main dining hall), plaintiff has not even described in his declaration why or how he was prevented from eating in the main dining hall. In addition, plaintiff's assertion that defendant Halverson never saw him in the main dining hall because, if he had, he would have written plaintiff up, is pure speculation outside the parameters of plaintiff's personal knowledge. The court declines to find that plaintiff's "bald, uncorroborated, and conclusory assertions" suffice to raise a triable issue of material fact as to whether he could, and did, eat regular food in the main dining hall during May 2005. *Neovi, Inc.*, 604 F.3d at 1159. Accordingly, the court considers DUF Nos. 21, 22, and 32 undisputed.

The regular dining hall served breakfast foods that included scrambled eggs, pancakes, grits, oatmeal, juices, and milk. DUF 33, PDF 33. Cold cereal was available most days, and kitchen workers like plaintiff always had access to cold cereal, and to all the food items on a daily basis before the regular meal was served to the general population. DUF 34, PDF 34. Sack

8

lunches were given out in the regular dining hall at the end of breakfast and typically consisted of a sandwich containing lunch meat, such a bologna, or peanut butter and jelly, as well as cookies, chips, or crackers, and a piece of fruit. DUF 36, 37. While defendant Halverson does not know exactly what was served for dinner in the regular dining hall during May 2005, side dishes typically served included sliced peaches, sliced pears, beans, bananas, peas, canned corn (not on the cob), mashed potatoes, bread, and rice.[6]

According to defendant Halverson, he has confiscated diet cards from other inmates for misuse, and in every instance, turned the card over to the dietician for appropriate action on the same day. DUF 25, 26. Defendant Halverson understood that "appropriate action could include permanent confiscation of the card if it was determined to be falsified, or if the inmate was not entitled to it," or, if the inmate was entitled to the card but had abused it, counseling about proper use of the card. DUF 27, 28. "In Halverson's observation, this was done by the Dietician the same day, so as not to cause hardship to an inmate who needed a special diet," but defendant Halverson himself had no control over the dietician's actions. DUF 29, 30. Defendant Halverson makes no representations about the specific confiscation of plaintiff's diet card. Plaintiff, on the other hand, declares that when he eventually spoke to the dietician after filing an inmate appeal regarding the confiscation of the card, the dietician informed him that he did not have plaintiff's card and would provide a new one. Dckt. No. 94 at 14, No. 9. As defendant Halverson provides no specific information about whether he turned plaintiff's card over to the dietician while plaintiff provides specific information that the dietician did not have his old card

---

[6] Plaintiff claims that DUF Nos. 36 (that sack lunches were given out in the regular dining hall at the end of breakfast) and 37 (describing what the lunches included) are disputed, citing to Nos. 7, 9, 10, and 12 of his declaration. The cited portions of the declaration aver only that plaintiff did not abuse his medically-necessary diet card (Nos. 7, 10), that defendant Halverson wanted to maliciously cause plaintiff harm by taking his diet card (No. 9), that defendant Halverson did not turn plaintiff's diet card in to the dietician (No. 9), and that he was not allowed in the main dining hall (No. 12). These facts do not create a dispute over the distribution and contents of sack lunches at CMF. The court has reviewed the remainder of plaintiff's declaration closely and finds no further information relevant to DUF Nos. 36 and 37 and accordingly will consider these facts undisputed.

9

and instead provided a new one, the court finds that whether defendant Halverson turned plaintiff's diet card in remains disputed.

The fastest way for plaintiff to get relief from the confiscation of his diet card would have been to submit a GA-22 inmate request for interview to several parties, including the dietician, plaintiff's supervisor, the food manager, and the watch commander. DUF 42. The dietician worked in the food manager's office, right next to the dining hall, and was also accessible from the main kitchen, where plaintiff worked. DUF 43. Plaintiff could have slipped the GA-22 under the office door the same day his card was confiscated, or approached any of those individuals. DUF 44. This would have given him an opportunity to explain whatever hardship the confiscation of his diet card caused and to seek return of the card. DUF 45.[7]

During 2005, California Code of Regulations, title 15, § 3084.7 provided for exceptions to the regular appeals process for appeals that warranted expedited processing. DUF 46, PDF 46. Section 3084.7(B) mandated that emergency appeals would bypass the first level of review and would be completed at the second level within five working days. DUF 47; PDF 47. Defendant Halverson was aware of this emergency appeal procedure during May 2006. DUF 48. Thus, it was his understanding that if plaintiff's lack of a diet card caused him real hardship, plaintiff could obtain relief through an expedited appeal. DUF 49.[8]

---

[7] Plaintiff claims to dispute DUF Nos. 42-45, citing to his declaration at Nos. 7-9, 12-16, 18, and Ex. A. The court has closely reviewed plaintiff's declaration and finds the only relevant information therein to be located at Nos. 14 and 18, in which plaintiff declares, in essence, that he did not seek to resolve the situation with defendant Halverson himself because he feared further recrimination and that the only way he knew to redress the situation was to file a standard inmate appeal. While plaintiff may have lacked awareness of the GA-22 request for interview process, his evidence does not dispute that that process would have been a fast way to resolve the diet card issue. Additionally, while plaintiff may not have wanted to attempt to resolve the issue with defendant Halverson himself, he provides no explanation of why he could not request an interview with the dietician, his supervisor, the food manager, or the watch commander. Accordingly, the court will treat DUF Nos. 42-45 as undisputed, except as to the extent DUF No. 42 states that plaintiff could have resolved the issue by going to defendant Halverson personally.

[8] Plaintiff claims to dispute DUF Nos. 48 and 49, citing to his declaration at Nos. 8, 9, 14, and in general. The court has reviewed plaintiff's declaration closely and finds no evidence therein that defendant Halverson was not aware of the emergency appeal system or did not

10

In addition, any inmate can request medical attention at any time by filling out a request for medical attention or calling "man down" by falling to the floor in front of a correctional officer, thereby prompting an immediate medical response. DUF 50, 51; PDF 50, 51. In defendant Halverson's experience, inmates at CMF are aware of this option and use it frequently to get medical attention. DUF 52. Thus, if plaintiff's loss of the no-meat card caused him physical suffering, he could have gotten immediate medical attention. Dckt. No. 53.[9]

---

understand that plaintiff could use that system to obtain redress. Rather, plaintiff simply avers that he himself was not aware of the emergency appeal system and that even five days was too long to wait to get his diet card back (No. 15). This fact does not create a dispute as to DUF Nos. 48 and 49, and the court will accordingly treat those facts as undisputed.

[9] Plaintiff purports to dispute DUF Nos. 52 and 53, citing to Nos. 7, 9, and 12-15 of his declaration. There, plaintiff states that his diet card was validly-obtained and he did not misuse it or eat in the regular dining hall (No. 7), that defendant Halverson took the card maliciously to harm plaintiff and did not turn it in to the dietician (No. 9), that plaintiff was not allowed in the regular dining hall (No. 12), that defendant Halverson deprived him of a nutritionally adequate diet intentionally to harm him (No. 13), that he "is a mental I/M patient, a (CCMS) (MHSDS) (ADA) Calif. Correctional Case Management System, Mental Health Services Delivery System, American Disability Act and Sgt. Haverson [sic] knows this, because every morning at 8:00 a.m., [he] had to go to pill call to get [his] psych medication from work" (No. 14), that he did not use the emergency appeal system because he did not know about it and five days was too long to wait for food (No. 15), and that defendant Halverson took the card illegitimately and should have known it was medically-prescribed to plaintiff (No. 15). This information in no way disputes defendant Halverson's evidence that, in his experience, CMF inmates are aware of the "man down" procedure and use it often to get medical attention.

The court has reviewed plaintiff's declaration closely, however, and finds certain other portions relevant to DUF Nos. 52 and 53. Plaintiff declares that, due to the loss of his diet card, he "lived for (18) days in pain and suffering" and lost weight (Docket No. 94 at 12), that he was prescribed the card by a medical doctor for his medical problems (*id.* at 12-14, Nos. 4, 6, 10), and that he did not seek medical attention for the symptoms he suffered after being deprived of his diet card because "when you are sick you request to see the doctor, and when you are hungry you go to the kitchen for food" (*id.* at 16, No. 17). Plaintiff claims that he did not seek medical attention despite his "pain and suffering," loss of weight, and inability to obtain the diet that had been prescribed to him by a medical doctor because medical staff would have "sent [him] to the kitchen for food." *Id.* at 16, No. 17. Plaintiff's uncorroborated claim that he could not have obtained treatment for the physical symptoms he allegedly suffered due to the confiscation of his diet card is belied by his competing claims that the diet card was medically necessary for him and actually prescribed by a medical doctor. Plaintiff provides no explanation why a doctor would prescribe him the card in the first place to treat his claimed stomach problems, but refuse to treat him for symptoms he developed because he had subsequently been deprived of the card. Accordingly, the court finds that plaintiff's declaration does not raise a triable issue of material fact as to the availability of medical care to plaintiff and considers DUF Nos. 52 and 53 undisputed. *Neovi, Inc.*, 604 F.3d at 1159.

11

**B.      Application of Eighth Amendment Principles to the Undisputed Facts**

A prison official violates the Eighth Amendment's proscription of cruel and unusual punishment where he or she deprives a prisoner of the minimal civilized measure of life's necessities with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To succeed on such an Eighth Amendment claim, a prisoner must show that (1) the defendant prison official's conduct deprived him or her of the minimal civilized measure of life's necessities and (2) that the defendant acted with deliberate indifference to the prisoner's health or safety. *Id.* at 834. To show deliberate indifference, the prisoner must establish that the defendant knew of and disregarded an excessive risk to inmate health or safety; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. A prison official may thus be free from liability if he or she did not know of the risk or took reasonable action in response to the risk. *Id.* at 844. The Eighth Amendment's prohibition on cruel and unusual punishment encompasses deliberate indifference by prison officials to some basic inmate need such as food. *See Wilson v. Seiter*, 501 U.S. 294, 303-04 (1991); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

Defendant Halverson argues that there is no triable issue of fact that he was aware of and disregarded an excessive risk to plaintiff's health. After careful review of the record, the court agrees. As described above, plaintiff has failed to submit evidence that raises a triable issue of fact disputing defendant Halverson's evidence that he knew that plaintiff was able to access the main dining hall after his "no meat" card was confiscated and could eat many of the foods served there. Defendant Halverson's undisputed evidence further shows that plaintiff had immediate access to medical or other staff to complain about the confiscation of his allegedly medically-necessary diet card and thereby obtain relief. Because defendant Halverson's evidence shows that he knew plaintiff could obtain food from the main dining hall after he confiscated plaintiff's "no meat" card or could immediately seek return of the card, and because plaintiff has failed to

submit sufficient evidence rebutting that evidence, plaintiff has failed to raise a triable issue of material fact that defendant Halverson was aware that his confiscation of the card would cause plaintiff to suffer food deprivation and attendant symptoms. Because plaintiff has failed to raise a triable issue of fact on this essential element of his Eighth Amendment claim against defendant Halverson for the confiscation of his diet card in May 2005, the court should grant defendant Halverson's motion for summary adjudication of this claim.

**V. Conclusion**

For the reasons explained above, it is RECOMMENDED that:

1. Defendant Halverson's December 10, 2010 motion for summary adjudication of plaintiff's Eighth Amendment claim against him regarding the confiscation of plaintiff's diet card in May 2005 (Docket No. 90) be granted; and

2. Defendants be given 30 days to file a pretrial statement as to plaintiff's remaining claims.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: August 9, 2011.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE